## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 03 2015, 5:56 am

Kevin S. Smith

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Amber M. Neal
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| A.M.,<br>*Appellant-Defendant,*<br><br>v.<br><br>Department of Child Services,<br>*Appellee-Plaintiff* | December 3, 2015<br><br>Court of Appeals Case No.<br>38A02-1506-JC-620<br><br>Appeal from the Jay Circuit Court<br><br>The Honorable Brian Hutchison,<br>Judge<br><br>Trial Court Cause No.<br>38C01-1206-JC-24 |

**Altice, Judge.**

## Case Summary

[1] A.M. (Father) appeals from the trial court's denial of his request to withdraw his consent to adoption of C.M. and N.M. (collectively, the Children).

[2] We affirm.

## Facts & Procedural History

[3] On June 15, 2012, the Department of Child Services (DCS) removed the Children from their home and filed a petition alleging the Children to be in need of services (CHINS) due to lack of parental supervision. The Children were adjudicated CHINS and placed with their maternal step-grandfather. The permanency plan was reunification of the Children with R.H. (Mother) and thus, Mother was ordered to participate in services.[1] Father appeared in person at the initial CHINS hearing held July 10, 2012, and for a fact-finding hearing on August 27, 2012. On September 19, 2012, Father was convicted of class C felony habitual traffic violator and sentenced to two years incarceration. Father appeared at a subsequent dispositional hearing via video conference.

[4] On November 8, 2012, the court entered an order for parenting time which provided that Father, who was then incarcerated in the Jay County Jail, should receive parenting time via video conferencing at least once every two weeks. On April 24, 2013, the trial court modified its parenting-time order to permit Father one two-hour visit every six weeks while he was incarcerated at the

---

[1] It does not appear that, at least initially, a parental participation order was entered with respect to Father.

Department of Correction. In April 2014, the court ordered that Father be provided services upon his release from incarceration.[2]

[5] On September 8, 2014, DCS reported that Father

> has minimally participated in services during this reporting period. He has submitted to random drug screens and has completed a substance abuse assessment. He has canceled appointments due to "working" or having to be present at his Uncle's Dr's appointments. [Father] has refused two drug screens for [the Family Case Manager], reporting at one point he would wait until the following week when it would be clean. [Father] has tested positive for Methamphetamine one time on a[n] oral drug screen through DCS. He has been positive two other times for his parole officer and admitted to using pain pills that he is not prescribed. [Father] has been arrested twice during this reporting period. He was arrested for battery and strangulation as well as invasion of privacy.

*Appellant's Appendix* at 432. Father was subsequently incarcerated on a parole violation because of his arrest. On September 23, 2014, the court declined to order additional services for Father and revoked Father's rights to parenting time. The court also changed the permanency plan for the Children from reunification to adoption.

[6] On October 28, 2014, while still incarcerated, Father executed consents to the adoption of the Children.[3] At the time Father signed the consents, a petition to

---

[2] The record indicates that Father was released from incarceration on April 24, 2014.

[3] Mother also signed separate consents to the adoption of the Children.

terminate his parental rights to the Children was pending.[4] Notwithstanding the executed consents, Father continued to write letters to the Children and requested a "goodbye" visit. *Transcript of May 12, 2015 Hearing* at 10. On February 17, 2015, DCS permitted Father to visit with C.M.[5] During that visit, Father learned that the Children were not receiving the letters he had been writing.

[7] Almost six weeks later, on March 30, 2015, Father filed a pro se request to withdraw his consent to the adoption of the Children. The court held a hearing on April 24, 2015, at which Father, who remained incarcerated, appeared by video conference and unrepresented by counsel. Father presented evidence in support of his request to withdraw his consent. Father then requested that counsel be appointed. The court granted Father's request and set the matter for further hearing on May 12, 2015. Additional evidence was presented to the court at the May 12 hearing. That same day, the court issued a written order denying Father's request to withdraw his consent to the adoption of the Children. The court also concluded that Father's request to withdraw his consent was untimely and that Father "failed to present any evidence supporting a finding that allowing him to withdraw his consent was in the

---

[4] The FCM informed Father that if he did not execute the consents, DCS was going to move forward with proceedings to involuntarily terminate his parental rights.

[5] N.M. refused to attend the visit with Father.

children's best interests." *Id*. at 603. Father now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[8] We begin by noting that the party seeking to withdraw consent to adoption must prove their case by clear and convincing evidence. *See* Ind. Code § 31-19-10-0.5. Where a party has the burden of proof and an adverse judgment is entered, if the party pursues an appeal, he or she does so from a negative judgment. *J.W. v. Hendricks County Office of Family & Children*, 697 N.E.2d 480, 481 (Ind. Ct. App. 1998). A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different from that reached by the trier of fact. *Id*. at 481-82. We will reverse a negative judgment only if the decision of the trial court is contrary to law. *Id*. at 482. In determining whether a negative judgment is contrary to law, we neither reweigh evidence nor judge witness credibility. *Id*. Rather, we consider only the evidence most favorable to the prevailing party together with all reasonable inferences flowing therefrom. *Id*.

[9] Similarly, in decisions relating to adoptions, we will presume the trial court's decision is correct. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). In other words, we will not disturb the court's ruling unless the evidence leads to but one conclusion and the trial judge reached the opposite conclusion. *Id*.

[10] Father argues that the trial court erred in denying his request to withdraw his consents to the adoption of the Children. The gist of Father's argument is that

his consent was invalid because it was conditioned upon his retaining contact with the Children. For a consent to adoption to be valid, it must be shown that the parent's consent was voluntary. *Matter of Adoption of Topel*, 571 N.E.2d 1295, 1298 (Ind. Ct. App. 1991). A parent's consent to an adoption is voluntary if it is an act of the parent's own volition, free from duress, fraud, or any other consent-vitiating factor, and if it is made with knowledge of the essential facts. *Id*. Further, consent to adoption is invalid where the parent retains the right to exercise visitation. *Id*. at 1299.

[11] Here, Father testified that he was "misled" by both the attorney representing him at the time he executed the consents and the FCM that even if he signed the consents to adoption, he "would not be cut out of the kid's [sic] life, that [he] would still be able . . . to write them and call them" after their adoption. *Transcript of April 24, 2015 Hearing* at 6. Father further testified that he was led to believe that once he was released from incarceration and he passed a drug screen that he "might be able to have some sort of visiting . . . privilege" with the Children. *Id*. Father maintains that had he been advised he would not be entitled to any contact with the Children, he never would have signed the consents to adoption.

[12] During the hearings on Father's motion to withdraw, Father's attorney at the time he signed the consents and the FCM both testified that they had met with and advised Father at separate times regarding the ramifications of signing, particularly that signing would not guarantee him post-adoption contact. While each admitted that they may have indicated that post-adoption contact was a

possibility, both his attorney and FCM testified that they made it clear such would only be possible through an agreement with the adoptive parent. The court clearly considered Father's argument and the evidence presented and found:

> [d]espite [Father's] assertions contrary [sic], . . . neither his counsel nor the FCM ever made any promise, guarantee, or other statement that would lead a reasonable person to believe he was certain to have post-adoption contact with the children. On the contrary, both informed him that the issue of post-adoption contact with the children would only be possible of [sic] the parties entered in to a post-adoption agreement or the adoptive parent voluntarily allowed same.

*Appellant's Appendix* at 602. We will not second guess the trial court's evaluation of the evidence in this regard. The trial court's determination that Father was not misled such that the validity of his consent was undermined is not erroneous.

[13] We further note that Father's mistaken belief that he would be able to maintain contact with the Children after their adoption does not render his consent invalid. Unlike the situation in *Topel*, here, there was no written agreement that "guaranteed visitation." *See Topel*, 571 N.E.2d at 1297. Father was advised of the consequences of consenting to the adoption of the Children and was never guaranteed any sort of post-adoption contact.

[14] Moreover, we note, as did the trial court, that Father's request to withdraw his consent to the adoption was untimely filed. I.C. § 31-19-10-3(a) provides that a

consent to adoption may be withdrawn not more than thirty days after the consent to adoption is signed. Here, Father signed the consents on October 28, 2014. He did not file his request to withdraw until March 20, 2015, well beyond the thirty days.[6]

[15]    Finding no error, we affirm the trial court's denial of Father's request to withdraw his consents to the adoption of the Children.

Judgment affirmed.

Robb, J., and Barnes, J., concur.

---

[6] Even after discovering that his efforts at contact were not fruitful, Father still waited nearly six weeks to file his request to withdraw his consents to adoption of the Children.